## JONES v. BLACKWELL.

Manufactured tobacco shipped in bond from the manufactory and stored in an export bonded warehouse on the 14th of June, 1872, was subject to the tax of thirty-two cents per pound, prescribed by the internal-revenue act of July 20, 1868. 15 Stat. 152.

ERROR to the Circuit Court of the United States for the District of Louisiana.

This action was brought by Blackwell against Stockdale, collector of internal revenue for the first collection district of Louisiana, and, on his death, revived against Jones, his executrix.

Judgment having been rendered against her, she sued on this writ of error.

The facts are sufficiently stated in the opinion of the court.

*Mr. Assistant Attorney-General Smith* for the plaintiff in error.
*Mr. J. D. Rouse* and *Mr. William Grant, contra.*

MR. JUSTICE HARLAN delivered the opinion of the court.

The tobacco described in the petition was shipped by Blackwell, the plaintiff below, in bond, from the manufactory in Virginia to the port of New Orleans, and was there entered in bond in an export bonded warehouse on June 13, 1872. On the 1st of July next thereafter he, by his agents, applied to the collector of internal revenue for the first collection district

of Louisiana, including the city of New Orleans, to withdraw the tobacco for sale or consumption, offering to pay a tax on the same at the rate of twenty cents per pound, as prescribed in the act of June 6, 1872. 17 Stat. 249. The collector refused to permit its withdrawal unless a tax at the rate of thirty-two cents per pound was first paid, as prescribed by the act of July 20, 1868. 15 id. 152.

Upon the trial in the court below the jury were instructed, among other things, that, on and after July 1, 1872, and prior to March 3, 1873, the only tax imposed by law upon manufactured tobacco was twenty cents per pound. The principal question before us is as to the correctness of that instruction.

By the first section of the act of July 20, 1868, a tax of thirty-two cents per pound was imposed upon all manufactured tobacco. The same act provided for a system of export bonded warehouses, to be designated and established by the Commissioner of Internal Revenue, at any port of entry in the United States, "for the storage of manufactured tobacco and snuff in bond intended for exportation." Manufactured tobacco, after being removed in bond from the manufactory to an export bonded warehouse, could, however, be withdrawn, upon payment of tax, for sale or consumption.

Up to Nov. 21, 1871, on which day the Commissioner submitted his annual report of the operations of the internal-revenue system for the fiscal year ended June 30, 1871, there had been established and were in operation sixteen of such export bonded warehouses. They were located in Massachusetts, New York, Pennsylvania, Maryland, Virginia, Louisiana, California, and Oregon. From the report of the Commissioner, of which we may take judicial notice, it appears that during that fiscal year 10,621,183 pounds were withdrawn for exportation from the several export bonded warehouses, while the quantity withdrawn from them for consumption during the same period was 11,499,659 pounds, — showing that less than one-half of the tobacco and snuff received in bond from the manufactory was actually exported. The Commissioner stated that from the eight bonded warehouses, established at the several ports of Philadelphia, Baltimore, New Orleans, San Francisco, and Portland, Oregon, in which were stored during the fiscal year

ended June 30, 1871, 9,437,257 pounds of manufactured tobacco, only 437,495 pounds during that period were withdrawn for exportation, while 8,480,656 pounds were withdrawn for consumption. " The practical operation," said he, " of this system of bonded warehouses hitherto' has been to give to a few individuals and firms, more particularly the proprietors of the warehouses, the same facilities for storing tobacco, *without the prepayment of tax*, as were given by the former system of class B, bonded warehouses, abolished by the act of July 20, 1868." He therefore recommended the abolition of the system of export bonded warehouses, as required by the best interests both of the government and of the manufacturer. The benefits to result from such abolition were that " a large portion of the expenses now [then] incurred by the manufacturers in exporting their goods would be saved, the government would receive the taxes on all goods *when removed from the place of manufacture*, all jobbers and dealers in manufactured tobacco would be placed on the same footing with regard to the traffic in tax-paid goods, and the special privileges and advantages enjoyed by a few individuals and firms would be removed."

It was doubtless because of these official recommendations from the head of the internal revenue system that Congress made the numerous amendments of the act of July 20, 1868, which appear in the act of June 6, 1872.

The contention of the defendant in error is, that while all manufactured tobacco stored in export bonded warehouses and withdrawn for sale or consumption *before* the first day of July, 1872, was subject to the tax prescribed by the act of July 20, 1868, all found stored in such warehouses on the 1st of July, 1872, without regard to the date of its deposit therein in bond, was subject, upon withdrawal *on* and *after* that date, for sale or consumption, to the reduced tax prescribed by the act of June 6, 1872. To this construction of the statute we cannot yield our assent.

It is true that the act of June 6, 1872, which took effect on the 1st of August, 1872, " except where otherwise provided," declares " that on and after the first day of July next," that is, July 1, 1872 there shall be assessed and collected on manufactured tobacco a tax of twenty cents per pound. But the sec-

tion (sect. 31) which so declares must be interpreted in connection with other provisions of the act, and with reference to the reasons which caused the radical changes made by that act in the internal-revenue system as previously established. We have already seen that the attention of Congress was called to the evils which had grown up under the system of export bonded warehouses, and to the necessity of its abolition. The act of June 6, 1872, gave effect to the recommendations of the Commissioner, and made such provisions as would enable him to dispense with such warehouses altogether. But 'a specific provision was made as to tobacco which had been previously placed in export bonded warehouses under the act of June 20, 1868. It was declared, " All tobacco and snuff *now* stored in any export bonded warehouse shall, on and after July 1, 1872, be subject to the same tax as is provided by this act, and shall, within six months after the passage of this act, be withdrawn from such warehouse upon payment of the tax, or for export, under the regulations of the Commissioner of Internal Revenue now in force concerning withdrawals of tobacco or snuff from bonded warehouses. And any tobacco or snuff remaining in any export bonded warehouse for a period of more than six months after the passage of this act shall be forfeited to the United States, and shall be sold or disposed of for the benefit of the same in such manner as shall be prescribed by the Commissioner of Internal Revenue, under the direction of the Secretary of the Treasury." We entertain no doubt as to the object of this provision. It evidently refers only to tobacco stored in export bonded warehouses *at the date of the passage of the act*, and not, also, as claimed by the defendant in error, to that stored in such warehouses after that date, and before the 1st of July, 1872. If Congress intended that *all* manufactured tobacco, whether at the manufactory or in an export bonded warehouse, should, on the 1st of July, 1872, have the benefit of the reduced tax of twenty cents, there would have been no necessity for a special declaration that tobacco " now " — that is, at the passage of the act — stored in export bonded warehouses should, *on* and *after* July 1, 1872, be subject to the tax prescribed by the act of June 6, 1872. The necessity for such declaration lay in the fact that unless tobacco, deposited in export bonded warehouses

prior to that act, was, in express terms, given the benefit of the reduced tax, it would be liable to the tax of thirty-two cents imposed by the act of July 20, 1868. This will become perfectly clear when attention is given to the regulations which the Commissioner of Internal Revenue had prescribed, and which were then in force, in reference to the shipment of tobacco in bond from the manufactory to an export bonded warehouse. Before any shipment could take place, it was necessary that an inspector should inspect, weigh, and mark each package of tobacco proposed to be shipped to an export bonded warehouse. His report of inspection indicated the marks and numbers of each package, the number of packages and their contents, the number of pounds, *the rate* and *amount of tax*. All these items were carried into the transportation bond which the shipper was required to execute. They appeared also in the report of inspection when the tobacco reached its destination; and, finally, when the tobacco was received by the storekeeper at the export bonded warehouse, the shipper was required to execute bond, with surety, binding him to pay " the amount of taxes due and owing " on the tobacco, the rate and amount of tax due thereon being described *on the face of the bond*, and being the same as that shown in the certificate of the inspector. So that as to all tobacco in export bonded warehouses on 6th June, 1872, the government then held bonds obligating the parties thereto to pay the tax, as to rate and amount, which appeared on all the official documents connected with the transportation from the manufactory to the bonded warehouse. Hence the specific provision giving the owners of tobacco, stored in export bonded warehouses on 6th June, 1872, the benefit, on and after the 1st of July, 1872, of the reduced tax, as well as the privilege of keeping it there for six months without removal or payment of tax.

But when Congress declared that tobacco stored in such warehouses, at the date of the passage of the act of June 6, 1872, should be subject to the tax provided by that act, it does not at all follow that tobacco stored in export bonded warehouses after the passage of that act, and before July 1, 1872, when the reduced tax took effect, was entitled to the benefit of the reduction. Such a construction of the act would be

inconsistent with the policy which dictated the abolition of the system of export warehouses, as well as with the necessary implications arising from the specific provision as to tobacco stored in such warehouses at the date of the act. It deprives the word " now " in the clause we have quoted of all meaning. If the tobacco in question had remained in the manufactory until July 1, 1872, it would have been subject to a tax of only twenty cents; but it could not on that day, and under the act of June 6, 1872, have been removed therefrom for sale or consumption except upon payment of the tax. If, however, Blackwell chose not to wait until that date, when the reduction would take effect as to all tobacco in the manufactory, but preferred to ship it in bond to an export bonded warehouse, between June 6, 1872, and July 1, 1872, he must abide by the terms of the bond given at the time his tobacco was deposited in such warehouse. His bond, upon its face, recites — if the statute was complied with — the rate and amount of tax prescribed by the law in force when the bond was executed. He could not satisfy its terms except by paying the amount it called for. That Congress gave the owners of tobacco stored in bonded warehouses on 6th June, 1872, the benefit of the reduced tax constitutes no reason why such reduction should be applied to tobacco stored in such warehouses after that date, when the owner had, prior to July 1, 1872, given bond covering the tax due under the then existing law. If the act of June 6, 1872, had prescribed an increase of tax to take effect on the first day of July thereafter, no one would contend that such increase would have applied to tobacco stored in an export bonded warehouse between June 6, 1872, and July 1, 1872. That Congress reduced, rather than increased, the tax, to be assessed and collected on and after July 1, 1872, does not authorize the court to relieve Blackwell from the obligations of his bond, given prior to that date, to pay the tax as ascertained and fixed by the law in force when it was executed; especially, since the act of June 6, 1872, did not go into effect before July 1, 1872, as to the reduced tax, except as to tobacco stored in export bonded warehouses on 6th June, 1872.

It results from what has been said that the collector rightly

demanded a payment of thirty-two cents per pound on Blackwell's tobacco, when, on July 1, 1872, he applied to withdraw it for sale or consumption.

Nor was the collector responsible for any damage to the obacco resulting from the delay in obtaining the necessary stamps after Blackwell's demand in August, 1872. The collector was then, it is true, without the necessary stamps, but he made requisition for them upon the proper authorities at Washington. In view of the refusal of the appellee to pay the tax upon the first application for withdrawal on 1st July, 1872, the collector was justified in believing that appellee would not pay the required tax, and he was, therefore, under no obligation to keep stamps constantly in readiness for him.

We perceive in the evidence no just ground upon which to rest a verdict against the plaintiff in error. The jury should have been instructed to find in her favor.

The judgment will be reversed, with directions for further proceedings in conformity with this opinion; and it is

*So ordered.*